UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

EDMUND KO,

                        Petitioner,

                                              <u>OPINION AND ORDER</u>

    -against-                                 06 Civ. 6826(JGK)

JOHN BURGE, WARDEN,
ELMIRA CORRECTION FACILITY;
LUCIEN J. LECLAIRE, JR.,
ACTION COMMISSIONER, NEW YORK STATE
DEPT. OF CORRECTIONAL SERVICES,

                        Respondents.

─────────────────────────────────────────

JOHN G. KOELTL, District Judge:


    This is a petition for habeas corpus pursuant to 28

U.S.C. § 2254, brought by Edmund Ko, who was convicted of

Murder in the Second Degree in violation of New York Penal

Law § 125.25(1), following a jury trial held in New York

State Supreme Court, New York County.  Judgment was entered

on October 16, 2000.  The petitioner is currently serving a

sentence of twenty-five years to life in the Elmira

Correctional Facility. The respondents are John Burge, the

Warden of the Elmira Correctional Facility, and Lucien J.

Le Claire, Jr., the Acting Commissioner of the New York

State Department of Correctional Services.

The petitioner challenges his conviction on three grounds. First, he asserts that he was denied his Sixth Amendment right to confront the witnesses against him when the prosecutor introduced the victim's out-of-court statement made to her friend on the telephone the night of the murder that the petitioner had just arrived at her apartment. Second, the petitioner claims he was denied his Sixth Amendment right under the Confrontation Clause when the State introduced a statement made by the petitioner's then-current girlfriend, Claudia Seong, to Detective Robert Mooney that a pair of bloody pants recovered from the victim's apartment belonged to the petitioner. Finally, the petitioner contends that he was denied his Sixth Amendment confrontation right and his right to present a defense by the prosecutor's refusal to grant immunity to Seong.

## I.

### A.

The evidence at trial was sufficient for the jury to find the following. On March 20, 1998, Lynda Hong, a third year student at Columbia Law School, was discovered in her home by her boyfriend, Christopher Lee, murdered. Lee had entered the apartment by using a credit card to open the door because he had been unable to get in touch with Hong for several days. He found her face down in a pool of

dried blood, wearing the clothes that she had worn when he
last saw her at dinner on March 18, 1998.  Her apartment
was in a state of disarray and there were blood spatters on
the bed, floor and window.  (Tr. at 2523-30.) After
speaking with Lee, the police learned that the petitioner,
a former boyfriend of Hong, and the petitioner's girlfriend
Claudia Seong had previously attacked another one of the
petitioner's former girlfriends, Diane Kim. (Tr. at 5132.)
The police interviewed the petitioner and Seong that
evening. (Tr. at 4870.) At the precinct, the petitioner and
Seong were questioned separately. (Tr. at 4895.) The
petitioner claimed that he had not had contact with Hong
for over a year. (Tr. at 4902.) When confronted with
pictures of a bloody shirt and sweatpants removed from the
crime scene, Seong began crying and said that the
sweatpants were the petitioner's and that the shirt was
hers but the petitioner often wore it. Seong was then taken
to see the actual clothes and repeated her statements. (Tr.
at 4912-16.)

The petitioner was placed under arrest that evening.
After an investigation, he was charged with one count of
Murder in the Second Degree. (Tr. at 4919, 5193.)

At the trial, the prosecution produced evidence that
Lynda Hong and the petitioner were romantically involved

while students at Cornell University. They began dating
when she was a senior and he was a sophomore, and were very
serious and had discussed marriage. (Tr. at 308, 756, 782-
83, 5246.) Their relationship ended in the fall of 1996.
They remained friendly and continued to call each other in
1997, although by the summer of 1997 most of their contact
had ceased. (Tr. at 784-85.)

In the spring of 1997, the petitioner began dating a
woman named Diane Kim. The petitioner's relationship with
Diane Kim lasted only about two months. (Tr. at 3285-87.)

Later in the spring of 1997, the petitioner became
involved with a woman named Claudia Seong. (Tr. at 406.)
The petitioner and Seong spoke frequently on the telephone
and he kept a picture of her on his work computer and used
her name as his screen saver and e-mail password. (Tr. at
4396-97.) The petitioner worked at Macy's when he first
began seeing Seong. Although the petitioner's performance
at work was regular from July through September, it became
sporatic in October, and in November he ceased working at
Macy's altogether. (Tr. at 4400, 4404.) Around the same
time, the petitioner moved into Seong's three bedroom
apartment in New Jersey. Seong's young daughter and a
tenant, "Steve" Young Sam Kim, shared the apartment. Seong
had frequent temper tantrums and accused the petitioner of

having slept with too many women. (Tr. at 2263, 2280, 2282.)

Although Lynda Hong and the petitioner had basically ceased all contact, the petitioner called her that spring to tell her that he was involved with someone who "knew what it was like to be jealous." (Tr. at 803, 806.) The petitioner also called Diane Kim and told her that he had a new girlfriend and was contacting his prior girlfriends in order to sever ties. He asked Kim to act as if she did not know him if they should see each other on the street. (Tr. at 3294-96.)

On November 18, 1997, upon returning home from work at 2:30 a.m., Diane Kim received a phone call from the petitioner who stated that he had to see her immediately. (Tr. at 3305.) The petitioner convinced her to meet him by telling her that he was bringing other women along. About fifteen minutes later, the petitioner, Claudia Seong, and her sister, Young Joo Seong, picked Kim up in front of her complex. They drove in silence until they reached a dark street closed off by a barricade. They exited the car and the group attacked Kim and left Kim on the ground bleeding. Kim walked home and contacted the police and an ambulance. She received stitches on her face, scalp and thigh and ultimately underwent laser surgery to remove the scars.

She had no further contact with the petitioner. (Tr. at 3312, 3315-29, 3337, 3339-42.)

On the night of March 18, 1998, Jae Young Shin, a friend of the petitioner's, went to Seong's apartment and told her that he had seen Lynda Hong in Manhattan and he had spoken to her about Edmund and his new girlfriend. (Tr. at 4985, 4998.) Shin reported that Hong said that Edmund appeared to have taken up with prostitutes after breaking up with her. (Tr. at 4985, 4997, 4998.) Seong became furious and told the petitioner that it was his fault that people thought of her as a prostitute, and slapped him in the face. (Tr. at 4985, 5000, 5003.)

On March 18, 1998 Lynda Hong worked the entire day at her job at a law firm. (Tr. at 1138-39, 1141-42.) She joined her boyfriend, Christopher Lee, for dinner at a restaurant around 9:00 p.m. (Tr. at 738, 2501.) Dinner ended at about 9:45 p.m. and Lee told Hong to call him when she reached her apartment and that he would come spend the night with her if she wanted. (Tr. at 2514-16, 2560-61.) After a brief stop at her friend Young Lee's apartment around 10:00 p.m., Hong told Young Lee that she was tired and was going home to sleep. (Tr. at 760-62, 776.)

That same evening, Edmund Ko was having dinner in Seong's New Jersey apartment with Seong, Young Sam Kim and

Seong's daughter. (Tr. at 2301-02.) Seong's friend Sorhan Lee called around 9:30 p.m. and they spent about fifty minutes on the telephone. (Tr. at 409-412, 428; 855-57.) While Seong was on the telephone, the petitioner, dressed in dark black pants, a knee-length black coat, a dark cap with "Parsons" on it and a pair of black ankle books, left the building. (Tr. 2303-05, 2310, 2413.) The petitioner then came back to the apartment and went into the bedroom, where he remained for about fifteen minutes before he left the apartment again carrying a brown bag with something inside that appeared to be eight inches to a foot in length. (Tr. at 2307-09.)

About 10:31 p.m. Hong called Celine Oh. While they were speaking, Hong received a call on the other line, which billing records show was made from the payphone on the corner of 114th Street and Amsterdam Avenue in Manhattan at 10:46 p.m. (Tr. at 862.) When Hong returned to the line with Oh, she sounded excited and nervous as she told Oh, "Oh my God, its Ed, he's coming over." Oh asked whether Hong meant her ex-boyfriend, and Hong said yes. (Tr. at 318-20, 325.) Oh said that it had been a long time and Hong agreed and said that she thought he was coming over because his girlfriend had kicked him out and he needed to talk. (Tr. at 320-21.) Oh and Hong spoke for about five more

7

minutes, at which time Oh heard a door lock being disengaged and knob turning. (Tr. at 322-23, 330.) Hong told her "It's Ed, I've got to go." (Tr. 322, 331-33.) Oh asked Hong to call her back to tell her what had happened. (Tr. at 322.) Hong never returned Oh's phone call. (Tr. at 323.)

Christopher Lee called Hong at about 11:30 that evening and got her answering machine. He left a message on it that he was going to sleep. (Tr. at 2518, 2567, 2570.) Hong never returned his call. (Tr. at 2520.)

The petitioner returned to Seong's apartment about two hours later. He was wearing the same dark coat. He went directly to Seong's room without stopping to speak with Steve, who then went to sleep and did not see the petitioner again for the rest of the night. (Tr. at 2312-15.) According to Steve, Seong did not leave the apartment during the entire two hour period that the petitioner was away. (Tr. at 2315.) Sometime the next afternoon, Seong told Steve that she had thrown the petitioner's shoes away the night before because she thought he had too many pairs. (Tr. at 2317-19.) That evening, Steve noticed that the petitioner was wearing a pair of Steve's shoes. (Tr. at 2317.)

The prosecution's theory was that Ko killed Hong to satisfy Seong. At trial, the State introduced evidence that Hong's time of death was estimated to be between 10:49 p.m. and 11:32 p.m. on March 18, 2007. (Tr. at 2759-62.) Further, there was a connection based on fiber analysis between Hong's apartment and Seong's car (Tr. at 3857-58, 3893-96.) The State also introduced evidence that a bloody footprint impression on a booklet removed from the crime scene was consistent with the petitioner's left foot, and not with Seong's. (Tr. at 4023, 4041-43, 4069, 4081, 4103, 4108, 4109.)

The defense argued that Seong and Shin had committed the murder. The petitioner introduced evidence that Shin and the petitioner were friends at Cornell but had a falling out in May of 1997 that resulted in a physical confrontation, leaving the petitioner's eye black and blue and swollen shut. (Tr. at 5410-13, 5426-29.) The petitioner also introduced evidence that Lynda Hong believed that the petitioner had changed, and that Hong was fearful of Seong. (Tr. at 803, 805, 807.)

**B.**

The petitioner appealed his conviction to the New York State Supreme Court, Appellate Division, First Department on April 22, 2002. (<u>See</u> Respondents' Appendix in Support of

Answer Opposing Petition for a Writ of Habeas Corpus
("Respondents' App."), Ex. A.)  His appeal alleged that the
State had improperly introduced hearsay testimony of
statements made by Hong to Celine Oh on the telephone, that
he was denied his constitutional right to confront
witnesses and present a defense by the State's refusal to
grant immunity to Claudia Seong, that proof of the assault
on the petitioner's former girlfriend was improperly
admitted to establish motive because any probative value
was outweighed by prejudice, and that the trial court's
rulings precluding the introduction of certain statements
made by Claudia Seong and Jae Young Shin violated the
petitioner's constitutional right to present a defense.
The petitioner also claimed that the State had failed to
establish the scientific acceptance of mitochondrial DNA.[1]

     In an opinion dated April 22, 2003, the Appellate
Division unanimously affirmed the petitioner's conviction.
People v. Ko, 757 N.Y.S.2d 561 (App. Div. 2003).  The court
ruled that Hong's statement to Oh, "It's Ed, I've got to
go" was properly admitted under the present sense
impression exception to the hearsay rule.  Id. at 562.

---

[1] As the State's expert witness, molecular biologist Dr. Marcia Eisenberg, testified at trial, mitochondrial DNA (MtDNA) is found in organelles known as mitochondria that are outside the nucleus, while nuclear DNA involves comparison of DNA from the cells' nuclei.  (Tr. at 4445-47.)  MtDNA testing can indicate only whether the sample came from someone with a particular maternal line.  Unlike nuclear DNA which can indicate whether the sample came from a particular person, MtDNA analysis may only lead to a conclusion that the known sample can or cannot be excluded from the maternal lineage. (Tr. at 4473-75.)

The statement was a spontaneous description of events as they were unfolding and was corroborated by extensive circumstantial evidence. The court also held that evidence of the petitioner's prior attack on an ex-girlfriend was properly admitted to establish motive and that the probative nature of the evidence outweighed any prejudicial effect. Id. at 563. As for the State's refusal to grant immunity to Claudia Seong, the court found that there was no bad faith or abuse of prosecutorial discretion, and that the petitioner's inability to call Seong as a witness did not adversely affect his defense. Id. The court also found that the trial court correctly determined that mitochondrial DNA analysis has been found reliable by the relevant scientific community, and noted that many jurisdictions have accepted this type of DNA evidence. Id. Finally, the Appellate Division found that the other challenged evidentiary rulings were proper exercises of discretion and that the petitioner had not been deprived of his right to confront witnesses and present a defense. Id.

On May 28, 2003, the petitioner sought leave to appeal the Appellate Division's decision to the New York Court of Appeals. (See Resp.'s Ex. E.) Chief Judge Kaye denied the petitioner's application by order dated January 2, 2004. People v. Ko, 808 N.E.2d 366 (N.Y. 2004).

On March 22, 2004, the petitioner sought a writ of certiorari from the United States Supreme Court, asserting that the prosecutor's refusal to grant immunity to Claudia Seong amounted to a denial of the petitioner's constitutional right to present a defense, and asking the Court to delineate a standard by which a trial court could determine when to compel the prosecution to grant immunity to a defense witness.  Also, in light of the Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36 (2004), the petitioner asked the Court to review the admissibility of Claudia Seong's statements to the detective as well as Lynda Hong's statements to Celine Oh. On June 14, 2004, the United States Supreme Court granted the writ of certiorari.  The Court vacated the judgment and remanded the case to the Appellate Division for reconsideration in light of Crawford.  Ko v. New York, 542 U.S. 901 (2004).

Following supplemental briefing by the petitioner and the State, the Appellate Division again affirmed the petitioner's conviction in an opinion dated February 3, 2005.  People v. Ko, 789 N.Y.S.2d 43 (App. Div. 2005).  The Court concluded that the petitioner preserved a Confrontation Clause argument with regard to the admissibility of Seong's statements to the police and that

the statements were testimonial within the meaning of
Crawford and were received for their truth. However, the
court found no basis for reversal. Id. at 44-45. The
Appellate Division found that the petitioner opened the
door to the admission of Seong's entire statement by
mentioning the issue of the clothing in the opening
statement and in seeking leave in opposition to the State's
motion in limine to introduce Seong's statement that the
shirt found belonged to her. The court noted that the
admission of only a portion of the statement would
misrepresent Seong's statement and that the petitioner had
thus made the entire statement admissible. Id. Finally,
the Appellate Division found that any error would have been
harmless beyond a reasonable doubt in light of the
overwhelming evidence of the petitioner's guilt and the
minimal impact of the challenged evidence. Id.

On March 4, 2004, the petitioner sought leave to
appeal the Appellate Division's decision to the New York
Court of Appeals, arguing that the Supreme Court's ruling
in Crawford had abrogated the "opening the door" doctrine
in the area of testimonial hearsay, and that the Appellate
Division had erred as a matter of state law in finding that
the petitioner had opened the door to the introduction of
Seong's statements. (See Resp.'s Ex. L.) Chief Judge Kaye

denied the request on August 29, 2005.  People v. Ko, 836
N.E.2d 1159 (N.Y. 2005).

The petitioner sought a second writ of certiorari from
the United States Supreme Court on October 28, 2005.  The
petitioner argued that the trial court's ruling that the
petitioner had opened the door to the State's introduction
of the detective's testimony as to Seong's statements
regarding the shirt and sweatpants was erroneous and in
conflict with the decision of the Court of Appeals for the
Sixth Circuit in United States v. Cromer, 389 F.3d 662 (6th
Cir. 2004).  The petitioner also reiterated the request
that the Supreme Court set forth the standard by which
prosecutors could be compelled to grant immunity to defense
witnesses.  The Supreme Court denied the petition on
January 9, 2006.  Ko v. New York, 546 U.S. 1093 (2006).
The petitioner filed the present petition on September 5,
2006.

## C.

Pursuant to the Antiterrorism and Effective Death
Penalty Act of 1996 ("AEDPA"), a federal court may grant
habeas corpus relief to a state prisoner on a claim that
was adjudicated on the merits in state court only if it
concludes that the state court's decision "was contrary to,
or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court
of the United States" or "was based on an unreasonable
determination of the facts in light of the evidence
presented in the State court proceeding." 28 U.S.C. §
2254(d)(1)-(2); see also Hawkins v. Costello, 460 F.3d 238,
242 (2d Cir. 2006); Walker v. Girdich, 410 F.3d 120, 122
(2d Cir. 2005). "Clearly established federal law" refers
only to Supreme Court "holdings, as opposed to the dicta,
of [the] Court's decisions as of the time of the relevant
state-court decision." Williams v. Taylor, 529 U.S. 362,
412 (2000); see also Bradley v. Burge, No. 06 Civ. 0040,
2007 WL 1225550, at *4 (S.D.N.Y. Apr. 19, 2007). A state
court decision involves an "unreasonable application of"
clearly established federal law if the state court's
application of Supreme Court precedent to the facts of the
case is "objectively unreasonable." Williams, 529 U.S. at
409 (O'Connor, J. writing for the Court in part II of her
opinion). "[A]n unreasonable application of federal law is
different from an incorrect application of federal law."
Id. at 410. Some increment of incorrectness beyond error
is required, but "the increment need not be great." Francis
v. Stone, 221 F.3d 100, 111 (2d Cir. 2000); see also Jones
v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Cotto v.
Lord, No. 99 Civ. 4874, 2001 WL 21246, at *8 (S.D.N.Y. Jan

9, 2001), <u>aff'd</u> No. 01-2056, 2001 WL 1412350 (2d Cir. Nov. 8, 2001).

All findings of fact made by the state court are presumed to be correct and it is the petitioner's burden to rebut those factual determinations by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The petitioner's three claims are addressed in turn.

## II.

The petitioner first argues that the trial court's admission of Lynda Hong's statement "It's Ed, I've got to go"[2] under the present sense impression exception to the hearsay rule, and the Appellate Division's determination that the evidence was properly admitted, was an unreasonable application of clearly established federal law and violated the petitioner's Sixth Amendment rights under the Confrontation Clause. The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him." The petitioner argues that under the principles explained in <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980) and <u>Idaho v. Wright</u>, 497 U.S.

---

[2] While various papers and decisions place a period after "Ed," the trial transcript uses a comma. (Tr. at 331, 332.) Nothing turns on the punctuation.

805 (1990), a hearsay statement satisfies the Confrontation
Clause only if the out-of-court statement falls within a
firmly rooted hearsay exception or if the statement has
particularized guarantees of trustworthiness so that it can
be found to be reliable.  The petitioner argues that the
New York State present sense impression exception as
interpreted by the New York Court of Appeals in People v.
Brown, 610 N.E.2d 369 (N.Y. 1993) violates the
Confrontation Clause because it permits the reliance on
factors other than the "totality of circumstances that
surround the making of the statement and that render the
declarant particularly worthy of belief" as required by
Wright.  497 U.S. at 820.  The petitioner also argues that
the State would not have been able to satisfy the
reliability test had it been applied.  The respondents
counter that the petitioner's claims were procedurally
defaulted as a result of his failure to raise them in the
state courts, and in any event, are meritless, because the
tests set forth in Roberts and Wright have been abrogated
by Crawford v. Washington, 541 U.S. 36 (2004). The
respondents also argue that the statement was properly
admitted because it did satisfy the test of reliability set
forth in Roberts and Wright, and that the New York State
rules require additional corroboration and not simply

reliability based on the totality of circumstances surrounding the statement.

**A.**

At the outset, the petitioner's argument is not, as the respondents argue, barred due to a failure to exhaust state court remedies. A petitioner in a habeas corpus proceeding must exhaust all available state court remedies for each claim prior to federal review. See 28 U.S.C. § 2254(b),(c); Daye v. Attorney Gen. of N.Y., 696 F.2d 186, 190 (2d Cir. 1982) (en banc); Caballero v. Keane, 42 F.3d 738, 740 (2d Cir. 1994). The exhaustion requirement requires the petitioner to have fairly presented in state court the claims which are raised in the habeas petition. See Picard v. Connor, 404 U.S. 270, 275-76 (1971); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991). The petitioner must present to the state court both the factual and legal premises of the claims. See Daye, 696 F.2d at 191. The Supreme Court has held:

> Because the exhaustion doctrine is designed to give
> the state courts a full and fair opportunity to
> resolve federal constitutional claims before those
> claims are presented to the federal courts... state
> prisoners must give the state courts one full
> opportunity to resolve any constitutional issues by
> invoking one complete round of the State's established
> appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To do this, "the prisoner must fairly present his claim in each appropriate state court ... thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal citations omitted); *see also* *Kellam v. Hunt,* No. 06 Civ. 4395, 2007 WL 2005544, at *3 (S.D.N.Y. July 10, 2007).

The respondents assert that the petitioner failed to raise the constitutionality of New York's present sense impression exception, as well as the argument that Hong's statement did not satisfy the reliability requirement, in the state courts.  Rather, the respondents urge that the petitioner only asserted before the Appellate Division that the trial court's determination was erroneous under New York's law of evidence because the prosecution did not offer sufficient proof to corroborate the statement. According to the respondents, the petitioner only complained that the trial court had failed to apply New York State's evidentiary rule correctly when the trial court admitted the statement, "It's Ed, I've to go," not that the rule itself violated his Sixth Amendment rights.

The petitioner counters that the underlying premise in his argument regarding Oh's testimony was always that the admission of the statement undermined his confrontation

rights under the Sixth Amendment.  The petitioner argues that the underlying problem with the lack of corroboration for the hearsay statement was that it failed the reliability test of Wright and Roberts. The petitioner points out that he specifically cited Wright and Roberts to the Appellate Division for the importance of particularized guarantees of trustworthiness and he argued that there were no guarantees of trustworthiness.

In Daye v. Attorney Gen. of N.Y., 696 F.2d 186 (2d Cir. 1982), the Court of Appeals for the Second Circuit stated that "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." Id. at 192.  The Court of Appeals explained that a petitioner can fairly present his constitutional claim to the state courts by any one of a number of means, including (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. Id. at 194; see also Abdurrahman v. Henderson, 897 F.2d 71, 73 (2d Cir. 1990) (holding that a petitioner can alert the

20

state court of the federal nature of his claims by relying

on federal and state cases employing constitutional

analysis, asserting particulars that highlight a

constitutional right, or alleging facts within the

mainstream of constitutional litigation); Palmer v.

Senkowski, No. 99 Civ. 9634, 2002 WL 54608, at *2 (S.D.N.Y.

Jan. 15, 2002).

Although the petitioner's brief to the Appellate

Division focused on the argument that the trial court

improperly failed to follow the corroboration requirement

for a present sense impression exception to the hearsay

rule when it admitted Lynda Hong's statements to Celine Ho,

the petitioner did cite to Roberts and Wright:

> It follows that, absent the requisite corroboration,
> the concern expressed in Brown has come to fruition--
> i.e., that "[t]he admission of a hearsay statement
> under any exception deprives the defendant of the
> right to test the accuracy and trustworthiness of the
> statement by cross-examination." (80 N.Y.2d 736). See
> also Idaho v. Wright, 497 U.S. 805 (1990) and Ohio v.
> Roberts, supra (discussing "particularized guarantees
> of trustworthiness"). In this case, the record on
> appeal is devoid of independent proof demonstrating
> the "trustworthiness" of the "contents" of Lynda
> Hong's statement that, indeed, it was Edmund Ko on the
> phone when she said "It's Ed; he's coming over." Also
> lacking was any corroboration that, indeed, Edmund Ko
> was at the door when Ms. Hong said "It's Ed; I have to
> go."

See Appellant's Brief to the Appellate Division, Resp.

Ex. A, at 52. These citations to relevant Supreme Court

21

cases implying the precise constitutional issues sought to
be raised in this petition, together with the assertion of
claims so particular as to call to mind the Confrontation
Clause issues argued in this petition, were sufficient to
alert the state court to the specific facts and
constitutional claims that are being asserted in the
current petition.

The petitioner's leave application to the New York
Court of Appeals included a statement that the "Defendant
intends to raise all those issues outlined in his brief
before the Appellate Division." This general statement,
and the accompanying citation to Morgan v. Bennett, 204
F.3d 360, 370-71 (2d Cir. 2000), sufficed to put the Court
of Appeals on notice of all of the claims raised in the
petitioners' Appellate Division brief. See Morgan, 204 F.3d
at 370-71 (holding that an initial letter to the Court of
Appeals which expressly requested "this Court to consider
and review all issues outlined in defendant-appellant's
brief and pro se supplemental brief" submitted to the
Appellate Division was sufficiently specific to alert the
Court of Appeals that the petitioner sought review of all
of the issues raised in his Appellate brief). Thus, the
petitioner fairly presented his Confrontation Clause claim

to the state courts, and satisfied the exhaustion requirement.

## B.

On the merits, however, the petitioner's argument fails. The petitioner argues that while the trial court admitted Lynda Hong's statement "It's Ed, I've got to go" on the basis of a New York State present sense impression exception to the hearsay rule, that exception is unconstitutional because it violates the Sixth Amendment Confrontation Clause. The petitioner argues that the statement was unreliable and its admission was unconstitutional.

According to the petitioner, the statement should have been analyzed under the Roberts and Wright cases that interpreted the Sixth Amendment to forbid the introduction of hearsay statements unless they bore adequate indicia of reliability. Because the trial court, and the Appellate Division when it affirmed the trial court's decision, did not require adequate indicia of reliability, and because the petitioner contends that this requirement could not be satisfied, the petitioner argues that the statement was impermissibly admitted without independent corroboration. In order to make this argument, the petitioner depends upon

an analysis of the constitutionality of hearsay exceptions that the respondents argue was abandoned in Crawford.

Prior to Crawford, the Supreme Court interpreted the Sixth Amendment to forbid the introduction of hearsay statements unless they bore adequate indicia of reliability. Reliability could be inferred when the statements satisfied a firmly rooted exception to the hearsay rules, but otherwise, hearsay statements were admissible only if the state could demonstrate that the statements bore "particularized guarantees of trustworthiness." Roberts, 448 U.S. at 66. Under this standard, the trial court analyzed whether the circumstances surrounding the making of the statement rendered the statement worthy of belief. See Wright, 497 U.S. at 819.

In Crawford, the Supreme Court held that the Framers of the Constitution intended that out-of-court "testimonial" statements be excluded from trial unless the declarant was unavailable for trial, and the defendant had a prior opportunity to cross-examine the declarant. 541 U.S. at 68. The Court also noted that not all out-of-court statements were governed by the Confrontation Clause, id. at 51, but made clear that the new test delineated in Crawford replaced the Roberts firmly rooted/particularized

guarantee of trustworthiness test for testimonial

statements. <u>Id</u>. at 68. While the Court did not spell out a

comprehensive definition of "testimonial," it gave examples

of a preliminary hearing, grand jury testimony, testimony

at a former trial, and police interrogations as testimonial

statements. <u>Id</u>.

<u>Crawford</u> did not clearly establish whether

nontestimonial hearsay statements were still to be analyzed

under the Confrontation Clause.  The Court acknowledged the

possibility that the Confrontation Clause should be limited

to the regulation of out-of-court testimonial statements,

leaving other out-of-court statements to be regulated

solely by the hearsay evidence rules.  The Court noted it

had rejected such an invitation in <u>White v. Illinois</u>, 502

U.S. 346, 352-53 (1992).  However, because the statement at

issue in <u>Crawford</u> was plainly testimonial—a statement given

pursuant to police interrogation—the Court did not need to

decide whether to abandon <u>White</u> at that time.  <u>Crawford</u>,

541 U.S. at 58 n.8; <u>see also</u> <u>United States v. Saget</u>, 377

F.3d 223, 227 (2d Cir. 2004) ("<u>Crawford</u> leaves the <u>Roberts</u>

approach untouched with respect to nontestimonial

statements. . . . Accordingly, while the continued

viability of <u>Roberts</u> with respect to nontestimonial

statements is somewhat in doubt, we will assume for

purposes of this opinion that its reliability analysis continues to apply to control nontestimonial hearsay.")

Not until Davis v. Washington, 126 S.Ct. 2260 (2006), did the Supreme Court explicitly address whether nontestimonial hearsay should continue to be analyzed under the Confrontation Clause. The Supreme Court noted:

> In Crawford, it sufficed for resolution of the case before us to determine that 'even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class'. . . . The Davis case today does not permit us this luxury of indecision.

Davis, 126 S.Ct at 2274. The Court cited the text of the Confrontation Clause which entitles the accused to be "confronted with the witnesses against him." The Court noted that the focus of the Confrontation Clause was thus on testimonial hearsay. The Court then concluded, "A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core', but its perimiter." Id.

Davis made clear that the Confrontation Clause can only be used to exclude out-of-court testimonial statements and that it does not apply to nontestimonial statements. See United States v. Williams, 506 F.3d 151, 157 (2d Cir.

2007); United States v. Feliz, 467 F.3d 227, 231 (2d Cir. 2006).

Hong's statement is plainly nontestimonial. It was made to a friend over the phone with no intervention of any government authorities. It was neither solicited by any law enforcement officers nor made in the context of any government investigation. It does not bear any of the hallmarks of testimonial statements identified by the Supreme Court in Crawford, such as "ex parte in-court testimony, extrajudicial statements. . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 51-52 (citations omitted).

Because the admission of nontestimonial hearsay is not barred by the Confrontation Clause after Davis, the petitioner's claim that the admission of Hong's out-of-court statement violated the Confrontation Clause has no merit. See Williams, 506 F.3d at 157 ("Because the Confrontation Clause does not bar such nontestimonial statements, whatever their guarantees of trustworthiness ... our Confrontation Clause inquiry is at an end.").

The petitioner argues that <u>Davis</u> does not apply because the petitioner's conviction became final before <u>Davis</u> was decided. This argument is also without merit. The petitioner cites the proposition that federal habeas courts must apply clearly established federal law as determined by the Supreme Court at the time of the state court determination.   <u>See</u> 28 U.S.C. § 2254(d)(1); <u>see also</u> <u>Mungo v. Duncan</u>, 393 F.3d 327, 333-34 (2d Cir. 2004) ("[F]ederal courts decide habeas corpus petitions not with reference to the Supreme Court's current jurisprudence, but either with reference to the Supreme Court jurisprudence as of the date of the pertinent state court 'adjudicat[ion] on the merits,' or the date when the state court conviction became final."); <u>Vasquez v. Strack</u>, 228 F.3d 143, 148 (2d Cir. 2000) ("If the petitioner's claim requires us to apply a rule of law that was not clearly established Federal law as determined by the Supreme Court at the time of the state court determination, section 2254 (d)(1) bars relief."). This principle, codified in AEDPA, derives from <u>Teague v. Lane</u>, 489 U.S. 288 (1989), which requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the conviction became final.   The Second Circuit Court of Appeals has also held that 28 U.S.C. 2254(d)(1) bars retroactive reliance on new

rules of law that were not clearly determined at the time of the conviction.[3] Mungo, 393 F.3d at 334 (citing Vasquez, 228 F.3d at 148).

The Teague rule is based on principles of finality and comity relating to the role of federal courts in deciding habeas corpus petitions challenging state court convictions. See Teague, 489 U.S. at 308-10. The rule requires federal courts to assess whether the state courts faithfully applied existing constitutional law at the time of their decisions. Id. The rule prevents federal courts from applying new rules of constitutional law to overturn state court convictions that had become final where the state courts correctly applied the law as it existed at the time, unless the narrow exception in Teague applied. Id. As the Supreme Court noted in Teague: "[S]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." Id. at 310 (quoting Engle v. Isaac, 456 U.S. 107, 128 n.33 (1982)).

---

[3] The rule of non-retroactivity in Teague is subject to two exceptions: First, "a new rule should be applied retroactively if it places 'certain kinds of primary conduct, private individual conduct beyond the power of the criminal law-making authority to proscribe." The second exception is for new "watershed rules for criminal procedure" that are necessary to the fundamental fairness of the criminal proceeding and improve the accuracy of the criminal process. Teague, 489 U.S. at 311; see also Mungo, 393 F.3d at 333. The Court of Appeals has not decided whether these two exceptions also apply to the requirement of 28 U.S.C. § 2254(d)(1). Mungo. 393 F.3d at 334-35.

The principle of non-retroactivity does not help the petitioner here.[4] The rule prevents a federal court from overturning a state court conviction based on a constitutional claim that was not recognized at the time the state court conviction became final. The rule relates to whether a federal habeas court can apply a new rule of constitutional law to find unconstitutional actions that occurred before a state court conviction became final. It does not allow a federal court to overturn a state conviction based on an alleged constitutional claim that is not valid at the time of the federal court decision. To apply the rule of non-retroactivity in that way would undermine the principles of finality and comity that were the basis for the rule. Moreover, the petitioner's argument fails because it is precluded by the statutory limit on habeas corpus relief for state court prisoners.

---

[4] The Supreme Court held that, under Teague, the Crawford rule that barred the admissibility of out-of-court testimonial statements unless the declarant was unavailable and had been subject to cross examination should not be applied retroactively to state court convictions that are reviewed on federal habeas review. Whorton v. Bockting, 127 S.Ct. 1173 (2007). This holding, however, does not affect the admissibility of Hong's statement to Oh where the issue is not whether an out-of-court testimonial statement should be excluded, but rather whether there is any Sixth Amendment basis to challenge the admissibility of a nontestimonial statement which, under Davis, there is not. The Supreme Court has also ruled that states may give broader effect to new rules of criminal procedure as determined by the Supreme Court, even if the Court itself has held that the new rules are not retroactive for purposes of collateral review of a state court conviction in federal court. The Court explicitly held that state courts were not bound by Teague to deny retroactive effect to Crawford. The decision, Danforth v. Minnesota, No. 06-8273, 2008 WL 441059 (U.S. Feb. 21, 2008), only applies to the remedies provided by state courts and does not affect the rule to be applied by a federal court reviewing a state court conviction. The Court explained: "The Teague rule was intended to limit the authority of federal courts to overturn state court convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own state's convictions." Id at *10. As explained above, in this case, there was no Sixth Amendment violation in the admission of Hong's statement.

The statute provides that a federal court "shall
entertain an application for a writ of habeas corpus on
behalf of a person in custody pursuant to the judgment of a
state court only on the grounds that he is in custody in
violation of the Constitution of laws of the United
States." 28 U.S.C. § 2254(a).  <u>Davis</u> made clear that the
constitutional claim asserted by the petitioner has no
merit.  Because Hong's statement was not testimonial, its
admission did not violate the Confrontation Clause.
Therefore, the petitioner is plainly not in custody in
violation of the Sixth Amendment.  Indeed, it is clear that
if for any reason the conviction were vacated, there could
be no objection under the Confrontation Clause to the
admission of the statement were the petitioner to be
granted a new trial. Therefore the petitioner's claim with
respect to the admission of Hong's statement provides no
basis for granting habeas corpus.

### III.

The petitioner next argues that the finding by the
Appellate Division that the petitioner opened the door to
the admission of Claudia Seong's testimonial statements
regarding the sweatpants found at the crime scene violated
the petitioner's due process and Sixth Amendment rights.
According to the petitioner, the state court mistakenly

concluded that a criminal defendant may open the door to the introduction of testimonial hearsay, and this decision amounted to an unreasonable application of clearly established federal law as determined by the Supreme Court.

**A.**

In his opening statement, the petitioner's attorney informed the jury that the evidence would demonstrate that Seong and Jae Young Shin actually killed Hong. The attorney stated that the jury would hear evidence that when Seong was shown pictures of the bloody clothes recovered from Hong's apartment that she collapsed in tears. The defense attorney stated:

> But Claudia Seong, like an actress, when she's shown a picture of these bloody clothes, she becomes convulsive and puts on the best crocodile tears you ever saw. And these clothes belonged to Edmund. Why were they left there so conveniently? Clothes that Edmund wore, and she wants to see the clothes, or they want to slow [sic] it to her directly, so she is taken to the laboratory where the clothes are and she's crying hysterically in the car, and then when she sees the clothes she puts on another performance and falls down on the floor in hysterics.

(Tr. at 106.) The State called Detective Mooney, who testified that he brought the petitioner and Seong from the apartment they shared in New Jersey to a precinct in New York on March 20, 1998. On March 21, 1998, the Detective and Lieutenant Caniglia spoke with Seong (Tr. at 4910) and

showed her photographs of the blue sweatshirt and gray
sweatpants that had been recovered from Hong's apartment.
(Tr. at 4911.) Upon seeing the photographs, Seong began
crying, and told the police that the shirt was hers and the
pants belonged to the petitioner, and that the petitioner
sometimes wore the shirt.  (Tr. at 4913.)  Detective Mooney
then testified that after the initial interview, he drove
with Seong to another precinct to view the clothes in
person.  When Seong saw the clothes in person, she
"literally was on the floor in tears, writhing and crying."
(Tr. at 4916.)  The detectives took her out of the room,
and questioned her again.  She repeated that the shirt was
hers, the petitioner often wore it, the pants belonged to
the petitioner, and that she was certain of that.  The
petitioner asserts that the state's introduction of Seong's
statement that the pants were the petitioner's violated his
Sixth Amendment rights.

The Appellate Division concluded that Seong's
statement was testimonial within the meaning of Crawford
and was received for its truth.  That conclusion was
plainly correct because the statements were made in
response to police interrogation.  See Davis, 126 S.Ct. at
2276 ("The product of such [law enforcement] interrogation
. . .is testimonial."); Crawford, 541 U.S. at 53 n.4

33

("[I]nterrogations by law enforcement officers fall
squarely within that class [of testimonial statements].").
The Appellate Division found, however, that the admission
of the statements was not a basis to reverse the conviction
because the petitioner had opened the door to the admission
of the statements, and, in any event, the admission of the
statements was harmless beyond a reasonable doubt.  Ko, 789
N.Y.S.2d at 45.

    The petitioner cites to a Sixth Circuit Court of
Appeals decision to support his claim that after Crawford,
normal evidentiary rules, such as opening the door, cannot
obviate the constitutional error arising out of the
introduction of a testimonial statement in violation of the
Sixth Amendment right to confrontation.  In United States
v. Cromer, the Sixth Circuit Court of Appeals read Crawford
to define the Sixth Amendment right to confrontation as so
fundamental that it was clear error for the trial court to
admit the hearsay evidence of a confidential informant's
description, even though such evidence had been solicited
by the defendant himself against warnings from the court.
389 F.3d 662, 678-79 (6th Cir. 2004). The Court of Appeals
commented:

        If there is one theme that emerges from Crawford, it
        is that the Confrontation Clause confers a powerful
        and fundamental right that is no longer subsumed by

the evidentiary rules governing the admission of
hearsay statements.  Thus, the mere fact that Cromer
may have opened the door to the testimonial, out-of-
court statement that violated his confrontation right
is not sufficient to erase that violation.

<u>Id</u>. at 679.

The <u>Cromer</u> decision cited no authority for the
proposition that a defendant cannot open the door to the
admission of evidence otherwise barred by the Confrontation
Clause. The decision has not been followed by any other
Court of Appeals.  It is inconsistent with other cases in
which the Supreme Court has held that a defendant's
statement, otherwise inadmissible under other
constitutional provisions, can be introduced at trial to
impeach a defendant's conflicting trial testimony.  <u>See,
e.g.</u> <u>Michigan v. Harvey</u>, 494 U.S. 344, 351-52 (1990)
(statement taken in violation of the Sixth Amendment);
<u>Harris v. New York</u>, 401 U.S. 222, 224-25 (1971) (statement
taken in violation of the Fifth Amendment).  The Supreme
Court has rejected arguments that would allow a defendant
to turn the illegal method by which the Government obtained
evidence to the defendant's advantage by providing the
defendant with a shield against contradiction for untruths.
<u>Harvey</u>, 494 U.S. at 351 (collecting cases).  If the <u>Cromer</u>
rule were correct, a defendant would be free to mislead a
jury by introducing only parts of an out-of-court

statement, confident that the remainder of the statement
could not be introduced because the Confrontation Clause
would provide a shield.  The only rationale that the Court
of Appeals used to support that result was the fact the
Supreme Court viewed the right to confrontation as
fundamental.  But there is no basis for concluding that the
Confrontation Clause can be used as a shield to allow a
jury to be misled, particularly when the Supreme Court has
refused to allow other constitutional rights to be used by
defendants as a shield for misleading the jury.  Finally,
reliance on the fundamental nature of the right to
confrontation in the Cromer decision is inconsistent with
the Supreme Court's conclusion that the Crawford decision
is not a watershed rule that is necessary to the
fundamental fairness of the trial, and the accuracy of
criminal proceedings.  See Whorton v. Bockting, 127 S.Ct.
1173, 1181-84 (2007); Mungo, 391 F.3d at 335. It is
unnecessary, however, to decide finally whether Cromer was
wrongly decided because it provides no basis for relief for
the petitioner.

 The petitioner's claim is a basis for relief only if
he can establish that the state court's rulings were
contrary to or constituted an unreasonable application of
clearly established federal law as defined by the United

States Supreme Court. See 28 U.S.C. § 2254(d). The
Supreme Court has not addressed the specific question of
whether a criminal defendant may open the door to the
admission of otherwise excluded testimonial hearsay. The
Sixth Circuit Court of Appeals is the only Court of Appeals
to have addressed the matter. Whatever the merits of the
Sixth Circuit's position, its decision is plainly not
clearly established federal law as defined by the Supreme
Court. Thus, the petitioner cannot establish a violation
of clearly established federal law by relying on Cromer.

The petitioner also asserts that he did not open the
door in his counsel's opening statement about Seong's
statements concerning the clothes. The petitioner argues
that his counsel only sought to introduce Seong's statement
that she owned the shirt as a declaration against her penal
interest, and not Seong's statement that the petitioner
owned the sweatpants, which he claims would be inadmissible
hearsay. The petitioner suggested that Seong had planted
the clothes in order to frame the petitioner. However, the
defense counsel's reference to "clothes" in his opening
meant both the shirt and the sweatpants, and allowing
admission of only a portion of Seong's statements would
have misrepresented the statements, as the Appellate

Division pointed out.  See People v. Ko, 789 N.Y.S.2d 43, 44 (App. Div. 2005).

The Appellate Division's decision thus was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1),(2).

**B.**

The Appellate Division also found that any error in allowing Detective Mooney to testify to Seong's statements was harmless beyond a reasonable doubt.  People v. Ko, 789 N.Y.S.2d at 45.  This Court may only overturn that finding if the petitioner demonstrates that this finding was contrary to or constituted an unreasonable application of clearly established federal law.  See Zappulla v. New York, 391 F.3d 462, 466-67 (2d Cir. 2004).  The petitioner has the burden of establishing that the state court was objectively unreasonable in finding that the error did not contribute to the verdict. See Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003).

According to the petitioner, Detective Mooney's testimony constituted the sole evidence which exclusively

tied the petitioner to the sweat pants found at Hong's apartment.

The petitioner's argument is unpersuasive. Detective Mooney's testimony did not constitute the sole evidence that established that the petitioner owned the sweatpants or that tied him to the scene of the crime. Young Sam Kim, Seong's roommate, also testified that the clothes had been shared by the petitioner and Seong. (Tr. at 2340-42.) The petitioner argues that Kim's testimony did not establish how often, where and when the petitioner would have worn the garments, but Seong's statement that the petitioner was the owner of the sweatpants did not establish this either. Both statements tied the petitioner to the sweatpants, and neither placed him at the scene of the crime.

Moreover, evidence that placed the petitioner at the scene of the crime was extremely strong without the statement about the sweatpants. Forensic evidence established that the petitioner's hairs were found on the sweatpants, and that a partial bloody footprint on a tax booklet on Hong's living room floor was consistent with the petitioner's foot and not with Seong's. (Tr. at 4023, 4041-43, 4069, 4081, 4103, 4108, 4109.) This evidence, together with Hong's statement to Celine Oh that the petitioner was coming over, and surveillance videos demonstrating that the

petitioner had time to leave the apartment, commit the murder, and dispose of items after he returned to the apartment, underscores that the petitioner has not established that the state court's determinations amounted to an objectively unreasonable application of clearly established federal law.

## IV.

Finally, the petitioner argues that the prosecution's refusal to grant immunity to Claudia Seong violated his due process rights, as well as his Sixth Amendment rights to confront witnesses and present a defense, and that the Appellate Division's decision to uphold that refusal amounted to an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The Supreme Court has never held that there is a constitutional right to require the prosecution to grant immunity to any witness. See Autrey v. McKasle, 465 U.S. 1085, 1088 n.3 (1984)(Marshall, J., dissenting) (noting that the Supreme Court has not decided whether courts have inherent authority, derived from a defendant's due process right, to grant non-statutory immunity to defense witnesses, and the circuit courts of appeal that have

addressed the issue have produced divergent opinions).
Thus, the petitioner cannot show that the ruling of the
state court was contrary to any clearly established law of
the Supreme Court.  Instead, the petitioner culls
principles from due process and Confrontation Clause
Supreme Court jurisprudence to argue that the
constitutional principles of the right to present a defense
and call and confront witnesses are inviolate without a
valid state reason to preclude such proof.  The petitioner
argues that the Appellate Division's conclusory findings
that the petitioner "was not deprived of any constitutional
rights by the People's refusal to grant immunity to his new
girlfriend" and that "[t]here was no bad faith or abuse of
prosecutorial discretion" without explanation or support
amounted to an unreasonable application of clearly
established Supreme Court law. See Ko, 757 N.Y.S.2d at 563.

     The petitioner relies upon cases that are plainly
distinguishable.  Each case cited by the petitioner
concerns affirmative conduct on the part of the State to
prevent certain witnesses from testifying.  See Montana v.
Egelhoff, 518 U.S. 37 (1996) (concerning a legislative ban
on evidence of voluntary intoxication); Crane v. Kentucky,
476 U.S. 683 (1986) (concerning a judicial ruling
precluding witnesses from testifying); Webb v. Texas, 409

U.S. 95 (1972) (per curiam)(concerning judicial

intimidation of witnesses).  As the respondents point out,

Seong's decision not to testify was not encouraged or

compelled by the prosecution; rather, she made an

independent decision to avail herself of a constitutional

protection.

Moreover, the petitioner's argument fails even under

the test recently articulated by the Court of Appeals for

the Second Circuit on which he relies.  In United States v.

Ebbers, the Second Circuit Court of Appeals applied a two-

prong test which must be satisfied for the court to compel

a prosecutor to offer immunity: First, the petitioner must

show that the government has "used immunity in a

discriminatory way, has forced a potential witness to

invoke the Fifth Amendment through 'overreaching,' or has

deliberately denied 'immunity for the purpose of

withholding exculpatory evidence and gaining a tactical

advantage through such manipulation.'"  453 F.3d 110, 118

(2d Cir. 2006).  The second prong requires the petitioner

to show that the evidence given would be "material,

exculpatory and not cumulative and [would] not [be]

obtainable from any other source."  Id.

The petitioner cannot allege that the prosecutor's

decision was exercised in a discriminatory way, because no

state witnesses were granted immunity.  Nor can the petitioner show that the prosecutor threatened or intimidated Seong into choosing to avail herself of her Fifth Amendment protections.  The petitioner argues that the prosecutor refused to grant Seong immunity in order to keep exculpatory evidence from the jury and to gain a tactical advantage.  To buttress this claim, the petitioner cites the prosecutor's assertions in her opening statement and motion in limine that Ko acted entirely alone. However, the fact that the State urged that Ko alone committed the murder did not exclude the possibility that Seong was involved as an accessory, although not present at the scene of the murder.

There are obvious reasons why the State would not have granted immunity to Seong.  There was a possibility that Seong was an accomplice in the murder even if she did not participate directly.  Moreover, the situation was fraught with the possibility of collusion.  Once granted immunity, Seong could have falsely accepted sole responsibility with only the possible sanction of perjury.  See United States v. Turkish, 623 F.2d 769, 775 (2d Cir. 1980).  The petitioner's argument is also facially unpersuasive because of its inconsistency; the petitioner argues both that Seong

was in fact the actual murderer and that the State should have granted immunity to her.

Finally, the petitioner cannot even begin to make the showing required by the second prong in Ebbers that the testimony was material and exculpatory. There is no credible showing on the record that Seong was the murderer and that was why the petitioner wanted to call her to testify.

The petitioner has failed to show that the Appellate Division's determination constituted an unreasonable application of or was contrary to clearly established federal law as determined by Supreme Court. Indeed, the prosecutor's decision not to grant immunity to Seong would be sustained even under the test articulated by the Second Circuit Court of Appeals on which the petitioner relies.

**V.**

For the reasons explained above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied**.

The Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c) because the petitioner has failed to make a substantial showing of the denial of a constitutional right. The Clerk is directed to

enter judgment in favor of the respondents and to close

this case.

SO ORDERED.

Dated: New York, New York
      February 25, 2008

                                 John G. Koeltl
                        United States District Judge